IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-HC-02030-FL

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | MEMORANDUM OPINION |
| ) | |
| DAVID D. LUCE, ) | |
| ) | |
| Respondent. ) | |

This case came before the court on May 23, 2013, for an evidentiary hearing to determine the merits of the government's petition to commit respondent David Luce ("respondent") as a "sexually dangerous person" pursuant to 18 U.S.C. § 4248 (hereinafter "§ 4248"). The court renders this memorandum opinion in amplification of its pronouncement that respondent shall be committed to the custody of the Attorney General.

**BACKGROUND**

On February 9, 2011, the government initiated this case by filing a certificate of a sexually dangerous person as to respondent (DE # 1). At the time of his certification, respondent was in the custody of the Federal Bureau of Prisons at FCI-Butner serving a nine-month term of imprisonment, following the revocation of his supervised release imposed by the Northern District of Alabama. Respondent's original sentence, imposed by the District of Guam, was a 60-month term of imprisonment and a three-year term of supervised release following his conviction for Sexual Exploitation of Minors and a 60-month term of imprisonment and three-year term of supervised release following his conviction for Sending Obscene Visual Representations of the Sexual Abuse

of Children, both sentences to run concurrently. Respondent's projected release date was February 10, 2011, but his release was stayed by the certification.

At the outset of the May 23, 2013 evidentiary hearing, the parties stipulated that the first two criteria for commitment had been met, *i.e.*, that respondent had committed acts of child molestation and that respondent suffers from the serious mental disorders of pedophilia and borderline personality disorder. Accordingly, the sole contested issue was whether respondent, if released, would have serious difficulty refraining from child molestation or sexually violent conduct due to his pedophilia and/or borderline personality disorder.

The government presented the testimony of two experts, Dr. Lela Demby and Dr. Joseph Plaud, and stated its intent to call a third expert, Dr. Gary Zinik.[1] However, before Dr. Zinik could testify, respondent's counsel informed the court that it was respondent's desire to withdraw any further objection to the proceeding. The court then proceeded to issue its findings and conclusions on the record and to commit respondent to the custody of the Attorney General.

## DISCUSSION

**I.   Standard of Review**

The procedure for commitment under § 4248 was enacted as part of the Adam Walsh Child Safety and Protection Act of 2006, Pub. L. No. 109-248, 120 Stat. 587 (2006) (the "Adam Walsh Act"). The statute authorizes the government to certify for commitment individuals within the custody of the Bureau of Prisons. 18 U.S.C. § 4248(a). Such certification automatically stays the

---

[1] The court notes that while Dr. Zinik did not testify, his expert report and the reports of the other experts were admitted into evidence, and the court has considered the experts' reports, as well as their testimony, in rendering its decision.

2

person's release from custody, pending completion of the § 4248 proceedings, despite the expiration of the incarcerative portion of the person's criminal sentence. Id.

To obtain a commitment order pursuant to § 4248, the government must prove by clear and convincing evidence that the person (1) "has engaged or attempted to engage in sexually violent conduct or child molestation" in the past, id. § 4247(a)(5); (2) currently "suffers from a serious mental illness, abnormality, or disorder," id. § 4247(a)(6); and (3) as a result of the illness, abnormality or disorder, "would have serious difficulty in refraining from sexually violent conduct or child molestation if released," id. See United States v. Hall, 664 F.3d 456, 461 (4th Cir. 2012). "[C]lear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable." Hall, 664 F.3d at 461 (quoting Jimenez v. DaimlerChrysler Corp., 269 F.3d 439, 450 (4th Cir. 2001) and citing Addington v. Texas, 441 U.S. 418, 423–24 (1979)).

## II. Analysis

### A. Personal History

Respondent was 56 years old at the time of the evidentiary hearing. Respondent has two sisters, from whom he is estranged, and he has never married, has no children, and his parents are deceased. Respondent had a very troubled childhood, experiencing emotional and behavioral problems that made it necessary for him to attend school at a residential treatment facility, where additional staff were required for his supervision. Respondent has reported being sexually abused between the ages of ten and fourteen by multiple staff members at residential facilities and by a male teacher while he was in the fifth grade. While respondent's parents were reportedly supportive and

3

tried to obtain help for him, he dropped out of school in the eighth grade. Respondent has no significant work history and has received disability payments due to his mental illness since he was a teenager.

Respondent has been diagnosed with grand mal epilepsy, but has not had a seizure in years, and receives medication for hypertension and anxiety stabilization. He fractured his hip in 2008, which was surgically repaired, and at times uses assistive devices, including a cane, walker, and wheel chair, to ambulate. Respondent has a substantial mental health history, which includes at least fourteen hospital admissions. He has previously received numerous diagnoses, including schizophrenia, bipolar disorder, borderline personality disorder, multiple personality disorder, depression, schizoid personality disorder, pedophilia, dissociative identity disorder, and heterosexual pedophilia. Respondent has sought treatment for mental illness in the past, but has experienced difficulties in treatment and, many times, left treatment within a few days.

Respondent has intermittently received some sex offender treatment over the years, completing four weeks at Johns Hopkins in 1988. While at Johns Hopkins, respondent was administered a penile plethysmograph, which indicated that he experienced sexual attraction to pre-pubescent females and males and a slight attraction to adult females. Respondent was administered Depo Provera, which reportedly lessened the intensity of his pedophilic urges, but was discontinued due to the development of abscesses at the injection site. Respondent most recently reported that he has no present sexual interests and a low testosterone level.

### B. Criminal and Sexual Offense History

Respondent has no non-sexual criminal history. In June 1988, respondent was arrested and charged with disorderly conduct, after a twelve-year-old girl and her mother reported that respondent

4

made a lewd remark to the girl in a shopping center. An officer told respondent to leave the area, and respondent made an obscene gesture to the officer, which resulted in his arrest and the disorderly conduct charge. Respondent was later released. In the late 1990s, the Huntsville Police Department investigated respondent for taking Polaroid photographs of his genitals and placing them between items in the toy aisle in local retail stores. There is no evidence that he was charged criminally for this behavior. However, respondent admitted to Dr. Plaud that he did engage in the behavior once, but that he became frightened and left the store. Respondent was also investigated, but not charged, for exposing himself to his five-year-old niece.

On November 3, 2004, Mr. Luce was arrested at his home in Huntsville, Alabama and charged in the District of Guam with two counts of Sexual Exploitation of Minors and one count of Sending Obscene Visual Representation of the Sexual Abuse of Children. The basis for the charges is as follows.

On August 14, 2004, respondent posted a message on an internet site, alt.sex.pr-teens, using the online name of "wannapetyourkitty." The site was a known area for pedophiles to contact children. An FBI agent saw the posting and investigated, tracing payment for the account to a credit card held by Luce and his mother. On October 3, 2004, the agent, posing as a thirteen-year-old girl, began communicating with respondent and believed that respondent was planning to have sex with an underage girl. The agent contacted the National Center for Missing and Exploited Children and inquired if they had any information on "wannapetyourkitty" in their database, and they responded that the individual was trying to obtain nude photographs of underage children. They also reported several postings revealing that respondent was interested in having sex with children, and that he was in Huntsville, Alabama.

On October 7, 2004, respondent sent the undercover agent five digital images of underage girls engaging in sexual intercourse with men. By October 18, 2004, the agent had received more than one hundred e-mails from respondent, containing thirty-five videos and ten images of child pornography. Additionally, he received three movies with respondent in a variety of stages of undress, four of his groin area, and a movie of child pornography. Respondent then posed as a friend named John and sent the agent a telephone number. The agent later received emails showing a living room, believed to be that of respondent, a man naked from the neck down, more child pornography with prepubescent girls exposing their genitals, a preteen female and male having sexual intercourse with an adult female, and a preteen female taking a shower wearing a pink bathing suit.

On October 22, 2004, a female task force agent called respondent, pretending to be a thirteen-year-old girl from Guam. Respondent tried to convince her to spend the summer with him and tried to plan a trip to Guam to have sexual intercourse with the girl. He also discussed having an erection and talked about ways to masturbate. She asked him for an address so that she could send him a gift, and he provided the address through the "wannapetyourkitty" account.

Respondent was arrested and, after exhibiting erratic behavior in the local detention center, was sent to the Federal Medical Center at FCI-Butner to be evaluated for competency to stand trial. He was ultimately deemed competent and on September 22, 2005, pled guilty to one count of Sexual Exploitation of Minors and one count of Sending Obscene Visual Representation of the Sexual Abuse of Children. On January 19, 2006, he was sentenced to a 60-month term of incarceration and a three-year term of supervised release on both counts, to run concurrently. On April 28, 2009, he was released to supervision.

In April 2010, Luce failed to meet with his psychiatrist at the Madison County Mental Health Center. He did not show up for one appointment, cancelled a second appointment, and hung up the telephone when the doctor called him to reschedule. On May 11, 2010, Luce was violated for sending threatening letters and making threatening phone calls to his therapist, sending threatening letters to his sister, and noncompliance with mental health treatment. The probation officer noted that respondent was still exhibiting severe emotional disturbances and requested that respondent receive emergency psychological services or that he be sent back to prison. Respondent subsequently left threatening voice messages for his therapist and refused to visit with his psychiatrist, and the probation officer requested that respondent's supervised release be revoked. On June 15, 2010, respondent was sentenced to a nine-month term of imprisonment.

### C. Incarcerative History

On January 5, 2011, while in custody at FCI-Butner, respondent sent letters to the University of Alabama at Birmingham Mental Health Center and a newspaper, among other places, stating that he was going to be released from prison to Birmingham without any housing or treatment and that he would return to his pedophilic conduct or commit suicide if he did not receive the proper support. He described, in detail, how he would rape and kill an eight-year-old girl if he was released with no resources. Respondent also admitted to a Bureau of Prisons psychologist that he had sexually molested eight children, for which he had never been charged, an admission that he had made previously and that he reiterated to Dr. Plaud.

While incarcerated, respondent also received incident reports for self-mutilation, being insolent to staff, using of abusive language, refusing a drug test, and threatening to kill his psychologist. It was noted that as his release date neared, respondent became more agitated and

7

began to act out. On several occasions, respondent was informed not to try to contact several people whom he was trying to threaten or intimidate, including one of his sisters, but he persisted in the conduct. In 2012, respondent sent a threatening letter to President Barack Obama stating that he wanted to kill the President.

While at FCI-Butner, respondent was prescribed psychotropic medications, but his compliance was sporadic. He made frequent complaints to staff and was resistant to treatment, frequently wavering between cooperating with treatment (attending appointments, taking medications) and demanding to be removed from services, insisting on a transfer, and stopping his medications. Weekly psychotherapy sessions were interrupted by frequent placements in restricted housing for psychological reasons, and his progress in therapy was minimal. At times he would appear highly motivated for treatment, but has also previously admitted on several occasions that he purposefully sabotaged his treatment by acting out in order to avoid discussing his problematic areas. Respondent had difficulty following rules and procedures and demanded placement in segregation following the slightest frustration. He would deteriorate rapidly when frustrated and resort to head banging, refusing meals, and make suicidal statements or gestures for attention.

Respondent sought sex offender treatment at FCI-Butner and was conditionally accepted upon completion of an Axis II treatment program for his borderline personality disorder, which had been determined to interfere with his ability to engage in sex offender treatment. Respondent withdrew from the Axis II program within two days. Respondent also began the Commitment and Treatment Program ("CTP") for persons held under § 4248 at FCI-Butner, but withdrew after less than one month.

8

### D. Criteria for Commitment Pursuant to § 4248

Respondent stipulated at the outset of the evidentiary hearing that the first two prongs for civil commitment under § 4248 are established and later withdrew any further objection to this proceeding. Moreover, the court finds, by clear and convincing evidence, that the government has demonstrated that respondent meets the criteria for commitment under § 4248.

#### i. Sexually Violent Conduct or Child Molestation

Child molestation is defined as "unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years." 28 C.F.R. § 549.93. See United States v. Comstock, 627 F.3d 513, 520 (4th Cir. 2010) (defining child molestation by reference to 28 C.F.R. § 549.93). Respondent has previously reported molesting eight prepubescent children and was convicted for the sexual exploitation of minors. Moreover, respondent stipulated that this prong was satisfied. Thus, the government has established the first prong of sexual dangerousness by clear and convincing evidence.

#### ii. Serious Mental Illness, Abnormality or Disorder

All three experts opined that respondent suffers from pedophilia. Pedophilia is a paraphilia, the diagnostic criteria for which include recurrent, intense, sexually arousing fantasies, sexual urges or behaviors involving sexual activity with prepubescent children. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, § 302.2, at 572 (4th ed., Text Revision 2000). Dr. Demby noted that respondent has demonstrated a pattern of repeated sexual arousal to male and female children since early adulthood. Respondent stipulated that he suffers from pedophilia, and there is no dispute that respondent's pedophilia causes him distress and serious functional impairment. See United States v. Caporale, 701 F.3d 128, 137 n.4 (4th Cir. 2012)

9

(explaining that the "true thrust of the § 4247(a)(6) inquiry [is] whether, on a case-specific basis, the respondent's underlying condition constitutes a serious functional impairment."). Accordingly, the court finds by clear and convincing evidence that respondent currently suffers from the serious mental disorder of pedophilia.

All three experts also opined, and respondent stipulated, that he suffers from borderline personality disorder.[2] Dr. Zinik explained in his report that borderline personality disorder is characterized by a pervasive pattern of instability of interpersonal relationships, self image, and emotional expression, as well as marked impulsivity and manipulation. Dr. Demby testified that respondent has carried the diagnosis of borderline personality disorder for quite some time and that he consistently exhibits characteristics of the disorder, such as sabotaging relationships with his treatment providers, showing a high degree of impulsivity and poor judgment, making suicidal gestures, and feeling despondent.

Dr. Demby, who was formerly a psychologist at FCI-Butner, previously provided crisis management services to respondent, and testified that he would frequently engage in head banging or other self-harming or destructive behavior to receive psychological intervention. Dr. Plaud testified that respondent exhibits deficits in social functioning, impulse control, chronic instability, and attention seeking, all consistent with borderline personality disorder. Further, Drs. Demby and Plaud both testified to the pervasive and disruptive nature of the borderline personality disorder and its impact on respondent's ability to function in society. Accordingly, the court finds by clear and

---

[2] Dr. Plaud also diagnosed respondent with a litany of other psychological disorders, including major depressive disorder, somatization disorder, posttraumatic stress disorder, dysthymic disorder, schizotypal personality disorder, avoidant personality disorder, and dependent personality disorder.

10

convincing evidence that respondent currently suffers from the serious mental disorder of borderline personality disorder.

### iii. Serious Difficulty Refraining

Regarding this third prong for civil commitment under the Adam Walsh Act, the Fourth Circuit has provided the following general guidance:

> [T]he "serious difficulty" prong of § 4248's certification proceeding refers to the degree of the person's "volitional impairment," which impacts the person's ability to refrain from acting upon his deviant sexual interests. Kansas v. Hendricks, 521 U.S. 346, 358 (1997) (noting that statutory requirements that couple proof of dangerousness with proof of a mental illness or abnormality "serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control"); id. at 357 (noting that civil commitment statutes may "provide [ ] for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety ... provided the confinement takes place pursuant to proper procedures and evidentiary standards") (internal citations omitted); see also Kansas v. Crane, 534 U.S. 407, 414 (2002) (noting that "our cases suggest that civil commitment of dangerous sexual offenders will normally involve individuals who find it particularly difficult to control their behavior.") "[This] lack of control [or] inability to control behavior will not be demonstrable with mathematical precision. It is enough to say that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." Crane, 534 U.S. at 413, 122 S. Ct. 867 (internal quotation marks omitted).

Hall, 664 F.3d at 463.

All three experts agree that respondent, if released, will have serious difficulty refraining from child molestation or sexually violent conduct as a result of his borderline personality disorder and pedophilia. Dr. Zinik opined in his report that pedophilia and borderline personality disorder are a very dangerous combination of disorders for respondent and that respondent is so disorganized and dependent, that if released to the community without resources he will quickly become desperate

11

and might well molest a child just to get back into custody where he feels safe and protected. While Dr. Zinik scored respondent a "2" on the Static-99R, which placed him in the Low/Moderate risk category, he opined that dynamic factors such as deviant sexual interest in children, intimacy deficits (lack of intimate relationships with adults), poor emotional self-regulation, lifestyle impulsivity, dysfunctional coping in response to stress, poor anger management, and grievance thinking exacerbate respondent's risk to reoffend. Dr. Zinik also noted two "acute risk factors," collapse of social supports and emotional collapse, both of which he opined apply to respondent.

Dr. Demby testified that the importance of respondent's stated intent to reoffend, as detailed in the letters he sent to various public institutions, is extremely significant when viewed in the context of his borderline personality disorder. She found credible, as does the court, respondent's admissions that he will be unable to cope if released into the community with no resources or psychological support and, as a result, will commit an act of child molestation. Dr. Demby also noted that the level of detail with which respondent described his intent to rape and murder an eight-year-old girl is indicative of a fantasy driven by pedophilia. She opined that respondent, as a result of his borderline personality disorder, will be compelled to follow through on the threat to prove his prediction correct.

Dr. Demby also testified that respondent's borderline personality disorder causes him chronic instability and will prohibit respondent from making good decisions when agitated. Dr. Demby noted respondent's failure to participate in sex offender treatment, due in large part to his inability manage his emotional instability, but testified that respondent can receive treatment for both his borderline personality disorder and pedophilia in the CTP at Butner. Dr. Demby's actuarial assessment of respondent is consistent with that of Dr. Zinik, and she likewise concluded that

12

dynamic factors, such as sexual deviance and major mental illness, greatly increase respondent's risk of reoffending. Finally, Dr. Demby testified that respondent will have no period of supervision following his release and no other means of support. She opined that this will be a significant stressor for him and greatly heighten his risk of reoffense.

Dr. Plaud testified that respondent's borderline personality disorder is the primary mechanism that will lead respondent to reoffend. He explained that the interaction of respondent's pedophilia and borderline personality disorder have led to a lifestyle of instability in dealing with anxiety and depression, pervasive in every area of respondent's social functioning. Dr. Plaud noted that while he believes pedophilia is not a chronic condition in some cases, it is for respondent. Dr. Plaud testified that, due to the confluence of respondent's personality disorder and sexual disorder, he is one-hundred percent certain that, if respondent is released, within a period of time he will encounter a crisis that will lead him to decompensate. Dr. Plaud further opined that if respondent does not receive the necessary attention, he could respond by molesting a child.

Dr. Plaud explained that respondent's borderline personality disorder is the motivating factor and his pedophilia is a coping mechanism in reaction to anxiety, depression, isolation, and social withdrawal. He emphasized that respondent needs intensive treatment for his borderline personality disorder, to include Dialectical Behavior Therapy (DBT)–described by Dr. Plaud as a cognitive-behavioral treatment focused on ameliorating the most significant self-defeating behaviors associated with borderline personality disorder–and that respondent's pedophilia cannot be addressed without first treating his personality disorder. Dr. Plaud concluded that respondent has exhibited this pattern over decades and that there is no reason to believe that respondent will be successful if released into the community without treatment.

The court finds persuasive the testimony of the experts and finds by clear and convincing evidence that, as a result of the interaction of respondent's pedophilia and borderline personality disorder, he will have serious difficulty in refraining from sexually violent conduct or child molestation if released. Respondent's pedophilia and personality disorder are firmly rooted, as evidenced by his long history of mental illness and pedophilic behaviors. It is very likely, if not inevitable, that respondent will face great stress if released. If respondent does not receive the attention and treatment he needs and desires, the court finds it likely that he will act out against a child, *i.e.*, that respondent, if released, will have serious difficulty refraining from sexually violent conduct or child molestation due to his pedophilia and borderline personality disorder. Therefore, all three elements for commitment are established and respondent will be committed to the custody and care of the Attorney General.

Respondent acknowledged to the court the difficulty he has had in managing his borderline personality disorder and expressed his desire for help in addressing the problems this disorder has caused. The court is encouraged by respondent's recognition that he requires treatment for his serious mental disorders and hopes that he will fully take advantage of his opportunity to receive treatment. With regard to respondent's post-commitment treatment, the court finds persuasive Dr. Plaud's testimony that respondent requires specialized treatment, such as Dialectical Behavior Therapy (DBT), for his borderline personality disorder, in addition to sex offender treatment. Accordingly, based on the opinions of the experts in this case, and in particular the testimony of Dr. Plaud, the court recommends that respondent receive specialized treatment for his borderline personality disorder, such as Dialectical Behavior Therapy (DBT), in order to facilitate successful sex offender treatment.

Although the court is ordering respondent committed, this determination does not necessarily mean that respondent will be confined for the rest of his life. The statute provides for periodic review of the propriety of commitment. An annual report on respondent's condition will be submitted to the court, pursuant to 18 U.S.C. § 4247(e)(1)(B). Furthermore, the director of the facility where respondent will be housed may prompt the court to release respondent by certifying to the court "that he is no longer sexually dangerous to others, or will not be sexually dangerous to others if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment[.]" 18 U.S.C. § 4248(e). Finally, after the expiration of 180 days following each determination by the court regarding respondent's commitment, respondent may move for a hearing to determine whether he should be discharged. 18 U.S.C. § 4247(h). Should respondent participate and complete significant treatment while committed, the court will consider his discharge in proper course.

## CONCLUSION

As set forth on the record, and for the foregoing reasons, the court finds by clear and convincing evidence that respondent is a sexually dangerous person and subject to civil commitment pursuant to § 4248. Accordingly, respondent is committed to the custody of the Attorney General, with the recommendation that he receive specialized treatment for his borderline personality disorder, such as Dialectical Behavior Therapy (DBT), as well as sex offender treatment.

SO ORDERED, this the 3rd day of July, 2013.

_____
LOUISE W. FLANAGAN
United States District Judge